NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

_____

**GSC CONSTRUCTION, INC.,**
*Appellant*

**v.**

**SECRETARY OF THE ARMY,**
*Appellee*

_____

2021-1803

_____

Appeal from the Armed Services Board of Contract Appeals in Nos. 59402, 59601, Administrative Judge John J. Thrasher, Administrative Judge Michael N. O'Connell, Administrative Judge Timothy Paul McIlmail.

_____

Decided:  May 2, 2022

_____

PATRICK BERNARD KERNAN, Kernan and Associates Law Group, Washington, DC, argued for appellant.

ASHLEY AKERS, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for appellee.  Also represented by, BRIAN M. BOYNTON, WILLIAM JAMES GRIMALDI, MARTIN F. HOCKEY, JR., PATRICIA M. MCCARTHY; LAUREN M.

WILLIAMS, Office of Counsel, United States Army Corps of Engineers, Tulsa, OK.

————————————

Before LOURIE, PROST, and CHEN, *Circuit Judges*.

LOURIE, *Circuit Judge*.

GSC Construction, Inc. contracted with the United States Army Corps of Engineers ("the Army") to build two warehouses. After GSC failed to meet several deadlines, the Army terminated the contract for default. GSC appealed to the Armed Services Board of Contract Appeals ("the Board"). The Board denied GSC's appeal. *Appeals of GSC Constr., Inc.*, ASBCA Nos. 59402, 59601, 21-1 B.C.A. (CCH) ¶ 37751 (A.S.B.C.A. Nov. 24, 2020), J.A. 1–80 ("*Decision*"). We *affirm* the Board's decision for the reasons explained below.

## BACKGROUND

GSC is a contractor that specializes in building military structures. *See* Appellant's Br. 3–4. In 2011, the Army awarded GSC a contract to build two warehouses ("the SSA Warehouses"). *Decision*, slip op. at 2. Under the contract, GSC was required to start construction on September 26, 2012, and finish by February 3, 2014. *Id.*

After beginning construction, GSC encountered several obstacles that prevented it from completing the project. Two of those obstacles are particularly relevant to this appeal.

First, GSC began a dispute with the Army over the contract's scope. The dispute occurred when GSC selected a "waffle mat" foundation, which required removal of existing soil and replacement with "select fill." *Id.*, slip op. at 6. Despite selecting a waffle mat foundation, GSC did not remove and replace the soil; in its view, another contractor—Harper Construction, Inc.—was responsible for that task. *Id.*, slip op. at 7. At that time, Harper was working on a

separate project ("the TEMF Project") in the same location. For the TEMF Project, Harper was required to demolish and construct several other buildings. *Id.*, slip op. at 4. To ensure proper coordination between the two projects, the Army provided GSC with the contract specifications for the TEMF project "for information" purposes only. *Id.*, slip op. at 6–7; J.A. 4194.

After several months of discussion, the contracting officer formally directed GSC to remove and replace the soil, explaining that it was not Harper's responsibility. *Decision*, slip op. at 8. In support of his determination, the contracting officer pointed to § 6.3.1.1(e) of GSC's contract, which provides that GSC is "responsible for any specific site preparation required to accommodate the foundation design." *Id.*, slip op. at 5–8; J.A. 5202. In response, GSC agreed to begin the work under protest. Once GSC began excavating, however, it found the soil to be "heavy" and "very wet," which would require it to perform additional, specialized work. *Decision*, slip op. at 8. Ultimately, Harper, which had specialized equipment to address that issue, stepped in to remove and replace the soil. *Id.*

Second, GSC encountered issues when designing the cold-formed metal framing for the exterior walls. To design that framing, GSC was required to comply with the Unified Facilities Criteria ("UFC") 4-010-01, which establish the "[Department of Defense] Minimum Antiterrorism Standards for Buildings." *Id.*, slip op. at 12. As relevant here, there are different versions of the UFC: the 2007 version and the 2012 version. The 2012 UFC is more stringent than the 2007 UFC. *Id.*, slip op. at 13. The Army notified GSC that it should design the framing in accordance with the 2007 UFC. *Id.* Despite that guidance, GSC mistakenly used the more stringent 2012 UFC when creating its shop drawings for the framing. *Id.* GSC's quality control manager did not notice that mistake. *Id.* GSC then submitted its drawings to the Army. *Id.* The Army also did not detect GSC's mistake. Rather, it observed that GSC prepared the

drawings using the 2012 UFC and reviewed them under that standard. *Id.* Subsequently, the Army rejected several of GSC's drawings for failing to meet the 2012 UFC. *Id.* Both parties agree that, had the Army caught GSC's mistake and applied the less stringent 2007 UFC, it would have approved the drawings weeks earlier. *Id.*

Because of the soil dispute and the UFC oversight, GSC fell significantly behind schedule. Accordingly, on January 16, 2014, the contracting officer issued a notice to GSC stating that GSC was 145 days behind schedule and that the Army was considering terminating the contract for default. J.A. 8408. The notice also stated that the Army did not "condone any delinquency" or "waive any rights [it] has under the contract." *Id.* GSC responded that it was "confident" that it could complete the project by June 9, 2014. J.A. 8404. GSC, however, continued to fall behind schedule. As a result, on April 28, 2014, the contracting officer issued a second notice, again stating that GSC had failed to make sufficient progress, that the Army was considering terminating the contract, and that the Army does not forfeit any rights under the contract. J.A. 8398–99. GSC, in turn, responded that it "firmly believe[d]" it could complete the work by August 30, 2014. J.A. 8389. But again, GSC continued to fall behind schedule. Finally, on June 18, 2014, the contracting officer terminated GSC's contract with the Army for default. *Decision*, slip op. at 3.

GSC appealed the contracting officer's decision to the Board. According to GSC, it was entitled to a 321-day extension because of the soil removal dispute and the UFC oversight (among other allegedly excusable delays). *Id.* GSC also argued that it was entitled to $328,293.82 in damages and a conversion of the termination for default to one for the "convenience of the government." *Id.*

The Board denied GSC's appeal from the contracting officer's decision. First, the Board held that the Army had met its initial burden of proving that the termination for

default was justified. *Id.*, slip op. at 24. The Board noted that the contract's completion date was February 3, 2014, and that GSC, indisputably, "did not complete the work" by that date. *Id.*, slip op. at 2, 24.

Next, the Board held that GSC failed to show it was entitled to a 321-day extension as a result of the delays. With respect to the soil removal dispute, the Board determined that, under the contract, GSC was required to perform the work rather than Harper. *Id.*, slip op. at 25–27. In particular, the Board pointed to § 6.3.1.1(e) of the contract, which states that GSC is "responsible for any specific site preparation required to accommodate the foundation design." *Id.*, slip op. at 5, 25; J.A. 5202. With respect to the UFC version oversight, the Board found that, under the contract, it was GSC's responsibility to ensure that it used the correct UFC version. *Id.*, slip op. at 27–28. In support of its determination, the Board pointed to § 1.7 of the contract, which states that GSC "shall be responsible for . . . the coordination of all designs." *Id.*, slip op. at 28; J.A. 3349.

Finally, the Board rejected GSC's argument that, because the Army initially provided GSC with additional time to complete the project, it forfeited any right to enforce the original completion date. *Decision*, slip op. at 29–30. Judge McIlmail concurred, stating that GSC admitted its own subcontractors caused the delays. *Id.*, slip op. at 68.

GSC appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10).

## DISCUSSION

Our review of the Board's decision is limited by statute. *Kellogg Brown & Root Servs., Inc. v. Sec'y of the Army*, 973 F.3d 1366, 1370 (Fed. Cir. 2020) (citing 41 U.S.C. § 7107). We review the Board's legal conclusions de novo. *Id.* "Interpretation of a government contract is [a] question of law, which we also review de novo." *Elec. Boat Corp. v. Sec'y of*

*the Navy*, 958 F.3d 1372, 1375 (Fed. Cir. 2020) (citing *Forman v. United States*, 329 F.3d 837, 841 (Fed. Cir. 2003)). "Though not binding on [this] [c]ourt, we give the Board's legal conclusions careful consideration in view of the Board's considerable experience in construing government contracts." *Id.* (citing *Gates v. Raytheon Co.*, 584 F.3d 1062, 1067 (Fed. Cir. 2009)). We may only set aside the Board's factual findings if they are "(A) fraudulent, arbitrary, capricious; (B) so grossly erroneous as to necessarily imply bad faith; or (C) not supported by substantial evidence." *Kellogg Brown*, 973 F.3d at 1370 (quoting 41 U.S.C. § 7107(b)).

To terminate a contract for default, a contracting officer must have a "reasonable belief" that "there [is] no reasonable likelihood that the contractor could perform the entire contract effort within the time remaining for contract performance." *McDonnell Douglas Corp. v. United States*, 323 F.3d 1006, 1016 (Fed. Cir. 2003) (quoting *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987)); Federal Acquisition Regulation ("FAR") 52.249-10. As a defense to a termination for default, a contractor may assert that the government committed a prior material breach, thus excusing the contractor's nonperformance. *See, e.g.*, *Securiforce Int'l Am., LLC v. United States*, 879 F.3d 1354, 1362–63 (Fed. Cir. 2018) (citing *Laguna Constr. Co. v. Carter*, 828 F.3d 1364, 1369 (Fed. Cir. 2016)). Alternatively, the contractor may assert that it was entitled to a time extension based on a delay that resulted from "unforeseeable causes beyond [its] control and without [its] fault or negligence." *Sauer Inc. v. Danzig*, 224 F.3d 1340, 1345 (Fed. Cir. 2000) (quoting FAR 52.249-10(b)(1)); J.A. 3326.

GSC primarily makes three arguments on appeal. First, GSC argues that the Army breached the contract by requiring it to remove and replace the soil rather than Harper. Second, GSC argues that it was entitled to a time extension because the Army evaluated its drawings under

the wrong UFC version.[1]  Third, GSC argues that the Army forfeited its right to enforce the contract's February 3, 2014, completion date.  We address each argument in turn.

I

GSC first argues that the Army materially breached the contract by requiring it to remove and replace the soil for the SSA Warehouse site.  According to GSC, under the terms of its contract, it was not responsible for that task—Harper was.  Because of that breach, GSC asserts that its nonperformance was excusable.  In support of its argument, GSC points to Appendix RR of its contract, which states that "[Harper] shall provide the pad site for [GSC] complete within the calendar days indicated after [the notice to proceed]."  J.A. 5844.  In other words, GSC interprets the word "complete" to mean that Harper was responsible for *all* tasks, including the soil work.

The Army responds that it did not materially breach the contract.  According to the Army, various other provisions of the contract, including § 6.3.1.1(e) (further discussed below) expressly require GSC to remove and replace the soil.

We agree with the Army.  Here, the dispute boils down to whether GSC or Harper was responsible for removing the soil and replacing it with fill.  As is clear from the contract, GSC was responsible.

First, several sections of GSC's contract expressly state that *GSC* must remove and replace the soil.  For example, GSC's own proposal (incorporated into the contract), states

---

[1]    GSC alternatively argued that it was entitled to a time extension because of several other delays, including missing hairpins and an electrical design revision.  The Board denied GSC's arguments concerning those delays, and GSC does not challenge those denials on appeal.

that GSC will "[r]emove and replace . . . unsuitable fill . . . and replace it with select structural fill." J.A. 3671; *Decision*, slip op. at 25–26. Similarly, § 6.3.1.2 states that "[t]ime and weather conditions may affect the actual condition of the building site(s); therefore [GSC] shall . . . be solely responsible for . . . *any excavation* (if necessary) *[and] placement of select fill* (if necessary)." J.A. 5202 (emphases added); *Decision*, slip op. at 26. Additionally, § 6.3.1.1(e) states that GSC "is responsible for *any specific site preparation* required to accommodate the foundation design" that it "*prepared or proposed*," J.A. 5202 (emphases added), which here, indisputably, included removing the soil and replacing it with fill. *Decision*, slip op. at 25.

Second, GSC's argument regarding Appendix RR of its contract is unpersuasive. GSC insists that Harper was responsible for the soil work, referencing the provision that "[Harper] shall provide the pad site for [GSC] complete." J.A. 5844. But GSC's interpretation fails to give "reasonable meaning to all parts of the contract." *LAI Servs., Inc. v. Gates*, 573 F.3d 1306, 1314 (Fed. Cir. 2009) (quoting *Hercules, Inc. v. United States*, 292 F.3d 1378, 1381 (Fed. Cir. 2002)). Specifically, the word "complete" must be read in the context of the other provisions discussed above, which place the responsibility of the soil work for the SSA Warehouse site on GSC. If we were to construe the word "complete" as GSC does, to encompass Harper's assigned work *and* GSC's assigned work, that would render the remaining contract provisions meaningless.

GSC alternatively argues that other evidence, outside of its contract, proves that Harper was responsible for the soil work. In particular, GSC points to Harper's TEMF contract specifications. GSC recognizes that it is not a party to that contract. Still, it contends that § 3.2.1 of Harper's contract is relevant to this dispute because the Army initially attached it to GSC's task order. Section 3.2.1 states that Harper must "[o]verexcavate 8 feet below existing grade of existing soil and replace with inert fill." J.A. 4322.

According to GSC, that provision makes Harper "obvi-ous[ly]" responsible for the soil work. Appellant's Br. 15.

We are unpersuaded by GSC's argument. True, Har-per's contract specifications required Harper to "[o]verex-cavate" the "existing soil and replace with inert fill." J.A. 4322. But GSC neglects to mention a key fact: Harper was working on a *separate* project concerning the construction of *separate* buildings, i.e., the TEMF Project. The Army provided GSC with Harper's contract specifications for co-ordination purposes only, not to define the scope of GSC's obligations. *Decision*, slip op. at 7; J.A. 4194. Indeed, the Army marked Harper's contract with the following: "PROVIDED FOR INFORMATION ONLY – NOT IN CONTRACT." J.A. 4194. Within that context, it would be "an unwarranted leap to read the provision as requiring Harper to remove and replace soil" for the SSA Warehouse site, a task already expressly assigned to GSC under its own contract. *Decision*, slip op. at 26. Like the Board, we construe that provision as referring to the soil work for *other* buildings—those that the Army specifically assigned to Harper under Harper's contract. *Id.* In summary, we reject GSC's argument that another party's contract re-lieved it of its responsibility to remove and replace soil.

II

GSC next argues that the Board erred in denying its claim for a time extension for the UFC oversight. Accord-ing to GSC, it was entitled to a time extension because the Army negligently evaluated its drawings under the wrong UFC version (2012 instead of 2007). GSC further contends that, had the Army used the correct UFC version, it would have accepted GSC's drawings several weeks earlier.

We disagree with GSC's argument. Although GSC places much blame on the Army, it neglects to explain its own role in causing the delay. As the Board explained, be-fore construction began, the Army correctly notified GSC that it must use the 2007 UFC for its drawings. *Decision*,

slip op. at 13. Despite that notification, GSC "inexplicably" used the wrong version—the 2012 UFC. *Id.* The Army failed to correct that error. *Id.* But the Army's oversight, although unfortunate, did not entitle GSC to a time extension. As the Board observed, under the contract, GSC was responsible for coordinating the design work. *Id.*, slip op. at 28. For example, FAR 52.236-21(e), incorporated into the contract, states that "[a]pproval by the Contracting Officer shall not relieve [GSC] from responsibility for any errors." J.A. 3325 (incorporating FAR 52.236-21(e)). It further states that GSC "shall coordinate all such drawings, and review them for accuracy, completeness, and compliance with contract requirements." *Id.* Similarly, § 1.7 of the contract states that GSC "shall be responsible for . . . the coordination of all designs" and that GSC shall "correct or revise any errors or deficiency in its designs, drawings, [and] specifications." J.A. 3349. Here, GSC violated its contract obligations when it failed to ensure that it used the correct UFC version. And, as is clear from the record, that mistake by GSC set off the chain of events causing the delay.

GSC does not dispute that, under the contract, it was responsible for design coordination. Nor does it point to any error in the Board's analysis. Rather, it simply disagrees with the outcome. But mere disagreement is insufficient for reversal of the Board's decision. Accordingly, GSC's argument is unpersuasive.[2]

### III

Finally, GSC argues that the Board erred in holding that the Army did not forfeit the contract's completion date.

---

[2]    GSC also appears to argue that the Army's failure to apply the correct UFC version violated the duty of good faith and fair dealing. We reject GSC's argument for the same reasons.

According to GSC, because the Army initially provided it with additional time to complete the project, it necessarily forfeited any right to enforce the February 3, 2014, completion date.

We disagree with GSC's argument. As the Board explained, although the Army permitted GSC to work past the original completion date, it expressly and repeatedly stated, that it did not "condone any delinquency" or forfeit any rights under the contract. J.A. 8398; J.A. 8408; *Decision*, slip op. at 29–30. Indeed, the contracting officer "advised GSC that he regarded the February 3, 2014, completion date to be in effect," and while he "gave GSC another chance to complete by June 9, 2014 . . . GSC failed to take advantage of the reprieve, resulting in [the] termination." *Decision*, slip op. at 30. Given the Army's repeated reservation of its rights during construction, we fail to see how the Board erred in holding that there was no forfeiture. GSC's argument is thus unpersuasive.

In summary, we reject GSC's arguments that (1) the Army materially breached the contract by requiring GSC to perform the soil work; (2) GSC was entitled to a time extension because of the UFC oversight; and (3) the Army forfeited its right to enforce the contract's completion date.

## CONCLUSION

We have considered GSC's remaining arguments but find them unpersuasive. For the foregoing reasons, the decision of the Board is *affirmed*.

## **AFFIRMED**